ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

MARK J. WENKER
Assistant U.S. Attorney
Arizona State Bar No. 018187
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona  85004-4408
Telephone: (602) 514-7500
mark.wenker@usdoj.gov
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |
| Plaintiff, | |
| v. | |
| Twenty-one firearms, one partial firearm, and a large amount of ammunition and magazines of various caliber, | |
| Defendant *In Rem*. | |

Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

### NATURE OF THE ACTION

1.     This is a civil action *in rem* to forfeit property to the United States pursuant to 18 U.S.C. § 924(d) because the property was a firearm or ammunition involved in or used in a knowing violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), Felon in Possession of a Firearm.

2.     This is a civil action *in rem* to forfeit property to the United States pursuant to 18 U.S.C. § 924(d) because the property was a firearm or ammunition involved in or used in a knowing violation of 18 U.S.C. §§ 2 and 922(g)(1), Aiding and Abetting a Felon in Possession of a Firearm.

3.     This is a civil action *in rem* to forfeit property to the United States pursuant to 18 U.S.C. §924(d) because the property was a firearm or ammunition involved in or used in a knowing violation of 18 U.S.C. § 922(g)(5), Alien in Possession of a Firearm.

4.     This is a civil action *in rem* to forfeit property to the United States pursuant to 18 U.S.C. § 924(d) because the property was a firearm or ammunition involved in or used in a knowing violation of 18 U.S.C. §§ 2 and 922(g)(5), Aiding and Abetting an Alien in Possession of a Firearm.

5.     Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j), and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that give rise to this forfeiture action.  This Court has jurisdiction.  28 U.S.C. §§ 1345 and 1355, and 18 U.S.C. § 981(h).

## THE DEFENDANT IN REM

6.     The defendant consists of the following property:

1.     American Firearms .38 Special handgun, SN: 21146

2.     Izhmash Saiga-12, 12 gauge shotgun, SN: H12400463;

3.     Remington Gamemaster 760, 30-06 caliber rifle, SN: A6941560;

4.     Century Arms C39V2, 7.62x39mm caliber rifle, SN: C39V2A10596;

5.     Izhmash Saiga, 7.62x39 caliber rifle, SN: H09182091;

6.     Marlin 60, .22 caliber rifle, SN: 11173342;

7.     PTR Inc. PTR-91, .308 caliber rifle, SN: AW8999;

8.     Mossberg 12 gauge shotgun barrel, no serial number;

9.     Rifle, no make, model, or serial number;

10.     Iver Johnson Champion 12 gauge shotgun, SN: 70218A;

11.     Ruger SR-762, 7.62x39 caliber rifle, SN: 561-12548;

12.     Molot-Oruzhie Ltd VEPR, 7.62x54R caliber rifle, SN: 15VTP9040;

13.     Zastava PAP M92PV, 7.62x39mm pistol, SN: M92PV019868;

14.     Herbert Schmidt/Madison Import Corp .22 caliber revolver, SN: 110503;

15.     Smith & Wesson 686, .357 caliber revolver, SN: AAJ1862;

16.     High Standard DM-101, .22 caliber derringer pistol, SN: 2393209;

17.     Colt Lawman MK III, .357 caliber revolver, SN: 40189L;

18.     Martin Bascaran Martian Commercial, 6.35mm caliber pistol, SN: 13341;

19.     Taurus 85, .38 special revolver, SN: JG95037;

20.     Ruger MK III, .22 caliber pistol, SN: 270-98268;

21.     Smith & Wesson SD40 VE, .40 caliber pistol, SN: HEY2062;

22.     Taurus PT 24/7 Pro 9mm pistol, SN: TZE28160; and

23.     Large amount of ammunition & magazines of various caliber,

(collectively the "defendant property"). The defendant property is currently in the custody of the Federal Bureau of Investigation.

## INTRODUCTION

7.     Because of a felony conviction in 2004, Timothy Jason Wells ("Wells") was prohibited from possessing firearms or ammunition. In 2017, however, Federal Bureau of Investigation agents ("agents") learned that Wells had made numerous claims on Facebook that he personally owned firearms. Wells also shared a photograph on Facebook of him holding a long gun in the garage at his residence.

8.     On July 18, 2017, agents executed a search warrant on Wells' residence in Kingman, Arizona. A loaded American Firearms .38 Special handgun, SN: 21146 (Item 1 above; the "handgun"), was found in Wells' bedroom closet. Agents seized the handgun, along with numerous other weapons, a partial weapon, ammunition, and magazines that they also found in different locations throughout his house and garage, including in a gun safe.

9.     Wells was charged in *United States v. Timothy Jason Wells*, United States District Court, District of Arizona, CR 17-01114-PHX-DLR, with being a felon in

possession of the handgun. Wells pled guilty to being a felon in possession. On November 27, 2018, the Court entered a Second Amended Judgment and Commitment, forfeited Wells' rights to the defendant property, and sentenced him to 37 months in prison.

10.     William Miller ("Miller") filed a petition to the defendant property and contested forfeiture of the defendant property.  No other third party filed a petition to the defendant property in Wells' criminal case.

## BACKGROUND

### *Felony Conviction of Wells in 2004*

11.     On March 17, 2004, Wells was convicted of three counts of felony Unlawful Intercourse with a Minor 3+ years younger in the Superior Court of California, El Dorado County, Docket Number PO4CRF0087. Wells' offenses have never been reduced to misdemeanors and Wells' rights to possess firearms or ammunition have never been restored.  Since March 17, 2004 and through the present, Wells was and has been a prohibited possessor of firearms and ammunition.

### *Investigation of Wells' Facebook Account*

12.     Between September 2016 and May 2017, Wells made numerous Facebook posts referencing his use, possession, and access to firearms. Attached as Exhibit A is a photo that Wells uploaded to his Facebook page of him holding a long gun.

13.     Wells made numerous posts on his Facebook account in which he expressed hate for the government, law enforcement, various ethnic, political, and religious groups, as well as homosexuals. In several of his posts, Wells mentioned killing individuals in these groups. Additionally, Wells posted comments stating that he was building his own semi-automatic rifle, that he had a belt-fed machine gun, that he had his own shooting range, and that he was shooting on a daily basis. Wells also bragged in a post to pointing a firearm at a person at a gas station following a confrontation. Wells described himself in his posts as a skinhead, Neo-Nazi, "liberal killer," and a member of the South Bay Skinheads.

*Seizure of the Defendant Property at 6604 East Huntington Avenue, Kingman, Arizona*

14.     On July 18, 2017, agents executed a search warrant at Wells' 1,034-square-foot residence, 6604 East Huntington Avenue, Kingman, Arizona. Wells shared the residence with his wife, Elena Vladimirovna Pismennaya ("Pismennaya"), their young daughter, and his stepfather, Miller. In Wells' bedroom closet, agents found a 12-gauge shotgun shell and the handgun, which was loaded. *See* Exhibit B.

15.     Inside the garage was a locked gun safe.  Upon the agents' request, Wells opened the gun safe using a combination.  Inside the gun safe were the remaining weapons seized along with a partial weapon (Items 2-22 listed above). *See* Exhibit C.

16.     Wells knew the combination to the gun safe and opened it without hesitation.  Wells had access to and possessed, actually or constructively, everything contained in the gun safe.

17.     Item 9 listed above, rifle, no make, model, or serial number, is an "80 Percent Receiver," also known as an unfinished lower receiver.  As an unmarked partial firearm, this unfinished lower receiver was not included in Wells' later sentencing calculations and enhancements with the other 21 weapons.

18.     "80 Percent Receivers" are also known as "blanks," "80%ers," "80% blanks," and "80% lower," and are incomplete AR platform guns. Though made of many parts, most firearms are comprised of five major components: the stock, barrel, upper receiver, magazine, and lower receiver. A completed lower receiver by itself is considered a weapon, and regulated and controlled by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). An incomplete lower receiver is not. Stocks, barrels, upper receivers, and magazines likewise are unregulated and can be bought and sold without government oversight.

19.     Felons and others who are prohibited from possessing or buying firearms will at times buy unmarked, unfinished lower receivers (the "80 Percent Receivers"), complete them, and then add the remaining parts (stocks, barrels, upper receivers, and magazines) to create working guns that they could not otherwise legally obtain.

20.     Criminals prefer such weapons because, not only are they more easily obtained, they lack serial numbers and are difficult for law enforcement to track or connect to offenders. These untraceable guns are sometimes referred to as "ghost guns."

21.     Item 23 listed above, large amount of ammunition and magazines of various caliber, included the earlier-mentioned ammunition seized in Wells' bedroom, but primarily consisted of items seized in the garage gun safe, on the garage work bench, or on the garage floor. In all, 22,779 cartridges and shells of various calibers were found and seized from Wells' bedroom and from the garage. Twenty magazines, many of which contained ammunition, also were seized in the garage.  *See* Exhibit D.

22.     Below is a breakdown of the ammunition and magazines seized from Wells' residence:

| | |
|---|---|
| Wells' Bedroom – | Two (2) cartridges found in the handgun and one (1) shotgun shell. |
| Garage Safe – | Fourteen (14) magazines and eighty-five (85) cartridges. |
| Garage Workbench – | Six (6) magazines and three hundred eighteen (318) cartridges and shells. (Exhibit E) |
| Garage Floor – | Twenty-two thousand three hundred seventy-three (22,373) cartridges and shells. (Exhibit F) |

23.     The firearms, ammunition and magazines were voluminous throughout the house and garage.

24.     Outside of the home in the backyard, agents found several empty shotgun shells and it appeared to agents that someone had fired a shotgun from this location. *See* Exhibit G.

***Interview of Wells***

25.     In an interview on July 18, 2017, Wells claimed that, as far as he knew, all of the defendant property belonged to Miller. Wells claimed he did not own any firearms

or ammunition, and even though Miller sometimes shot guns in the field outside their house, he did not participate with Miller in the shooting.

26.     Wells said that the handgun found in his room was for protection, as a lot of people had been around their house recently racing quads and other vehicles.

27.     Wells said he grew up in California before moving to and living in Tennessee from 1992 to 1999.  He said he then moved back to California to live with his mother and stepfather, Miller. Following his mother's death, he, Miller, and Pismennaya decided to move to Kingman, Arizona, in November 2016. All three lived together along with Wells' and Pismennaya's young daughter.

28.     Agents told Wells that if he did not open the gun safe they would need to call a locksmith to break into the safe. Wells then quickly and easily input the combination from memory without making any errors. Wells said Miller had given him the combination so that Wells could retrieve money from it when he needed it. Wells also admitted that his fingerprints would be on most of, if not all of, the guns in the safe, as he sometimes moved the guns in and out of the safe.

29.     Agents noted that there was no money in the safe when it was opened.

30.     Wells said that Miller sold guns and gun parts, but that Wells never did so. Wells said he instead tried to sell custom printed t-shirts at gun shows.

31.     Wells said he liked to "rebel-rouse" and "talk shit" on Facebook. When asked if he ever made posts regarding owning and shooting firearms, he said "maybe once."

32.     When shown multiple posts he had made on Facebook in which he had claimed to own a shooting range, went shooting every day, owned various firearms (including a Browning m1919 machine gun and Glock handgun), and owned thousands of rounds of ammunition, Wells claimed that those posts were all "bullshit" and just him talking. Wells also denied the veracity of a post in which he claimed to have received a shipment of ammunition that was too heavy, or another in which he was looking to ship a gun part (or "80% lower") to a convicted felon.

33.     Wells was shown a picture he had posted on Facebook of him holding a shotgun. Wells said it was Miller's shotgun. Wells was shown five additional pictures, including a picture with two long guns (one of which was the same shotgun Wells was photographed holding), a rifle laying on a t-shirt that Wells had printed, and an 80% lower.

34.     Wells acknowledged taking the first three pictures and posting them on Facebook, including laying the rifle on the t-shirt for the picture. He said the last two pictures were taken by a friend and sent to him.

***Interview of Pismennaya***

35.     In an interview on July 18, 2017, Pismennaya said she married Wells on February 3, 2016, and that she, Wells, and Miller moved to Kingman in October 2015 or 2016. Pismennaya said that Miller's girlfriend Kathy Jones ("Jones") also stayed at the residence a few times a week. Miller stayed at both the Kingman residence and his girlfriend's house in Boulder City, Nevada. Pismennaya said that her daughter also lived at the Kingman residence.

36.     Pismennaya said Wells and Miller went to a gun show and sold t-shirts along with old radios and possibly magazine springs.

37.     Pismennaya said she did not know who owned the firearms in the house. When asked if Wells had access to the garage, where most of the guns and ammo were found, she said yes.

38.     Pismennaya said she had seen Miller and Wells together handle firearms, fix firearms, and fire firearms after fixing them.

39.     Pismennaya acknowledged that Wells had a Facebook page. She said that his Facebook comments showed that he wanted to help law enforcement clean up the country, and that Wells did not want to kill people, just hurt them.

40.     Pismennaya said Wells received shipments at the house from eBay, though she did not know if they contained ammunition. She said she had not seen Wells mail shipments of firearms from the house.

41.     When asked about the handgun found in the bedroom closet she shared with Wells, she said she guessed it belonged to him. She said her fingerprints may be found on the handgun because Wells showed it to her, and she may have touched it. She said she may have handled other guns in the house as she had to move the gun parts so she could clean the house.

42.     Pismennaya said that about five or six months earlier, three or four cars were driving down their road at night. The cars would stop at houses and turn off their lights. Wells was concerned about their safety, so he went into the garage and came back into the house with a rifle. He then had Pismennaya hold the rifle while he went and got a blanket. Wells then took the blanket and rifle and sat outside on the porch in front of the house.

43.     When shown a Facebook picture of Wells holding a shotgun, Pismennaya said she had taken the picture.

***Interview of Miller***

44.     In an interview on July 18, 2017, Miller said he had purchased a few 80% polymer lowers for AR-15s. When asked about Wells' interest in firearms, Miller said that Wells learned from his father how to take firearms apart. Miller said Wells does not own any firearms.

45.     Miller admitted that he was aware that Wells had been convicted in California of sex with a minor, but that conviction was "B.S." When asked if he knew if the conviction was a misdemeanor or a felony, he said he guessed it was a felony. Miller said that due to Wells' conviction he could not get a job because no one would hire him.

46.     When asked if he had seen Wells with firearms, Miller said in order for Wells to touch any firearms Miller had to be standing right there with him. Miller reiterated that the only time he had seen Wells with a firearm was when Miller was right there with him.

//

//

9

47.     A felon cannot possess firearms or ammunition, even if in the presence of a lawful possessor who owns the firearms or ammunition.   Wells was not permitted to possess the defendant property even if he did so in Miller's presence.

48.     When asked about the handgun found in Wells' bedroom, Miller said he did not know if Wells had a handgun there.

49.     When asked about Wells' use of firearms, Miller said Wells was trying to go on "the straight and narrow" and that, "If you want me to nail him, I can't."

50.     Miller was shown a Facebook picture of Wells with a shotgun. Miller admitted that the person in the picture might be Wells, but said the shotgun Wells was holding did not work.

51.     Miller was shown Facebook pictures from Wells' account of AR-15 upper receivers. Miller said that they looked like parts to an AR-15, but that he had not seen those parts before.

52.     Miller was shown a picture of an AR-15 on a t-shirt that was posted to Wells' Facebook account. Miller said that the AR-15 in the picture belonged to Miller. Miller said that he put the AR-15 on the t-shirt for this photograph.

53.     Miller said that Wells had a severe anger problem when it came to law enforcement. Miller said that when Wells was living in Henderson, Nevada, someone called the police on Wells. The caller said that Wells was holding people hostage and Wells was going to shoot people. Miller said that the only thing that saved Wells was that when the police arrived Wells was in his yard with a beer in his hand.

54.     Miller said that all of the firearms in the safe in the garage belonged to him. Miller said he could not provide receipts for any of the gun purchases because he does not keep receipts. Miller also said all of the guns and ammunition found in the house belonged to him.

55.     Miller was asked if he had an AR pistol like the one shown to him earlier in Wells' Facebook photograph. He said that he did not, but that he did have an AK pistol in his safe.

56.     Miller would not give agents the combination needed to open the gun safe in the garage. Miller said he was the only one who had the combination and that no one else, including Wells, had access to the safe.

57.     When asked, Miller said he had never seen Wells shoot a firearm at the property, but that he did not know what Wells did when he was gone. Miller said that he left his residence for days at a time to stay at his girlfriend's house, or to go to Las Vegas. Miller said he leaves the firearms and ammunition at his house when he leaves.

***Criminal case against Wells, CR17-01114-PHX-DLR***

58.     On August 16, 2017, Wells was indicted for felon in possession of the handgun.

59.     The government sought to forfeit the defendant property in the criminal case.

60.     On July 31, 2018, at his change of plea hearing, Wells pled guilty to felon in possession. In Wells' plea agreement he agreed to the forfeiture of the defendant property and that the defendant property was used to facilitate the commission of his offense.

61.     On August 16, 2018, the Court entered a Preliminary Order of Forfeiture forfeiting the defendant property.

62.     On September 18, 2018, Miller filed a petition with the Court for the return of the defendant property.

63.     On November 19, 2018, at Wells' sentencing, the defendant was found guilty of felon in possession of the handgun.

64.     The government contended that Wells should be held accountable for all of the firearms found in his residence, even those found in the gun safe, and Wells objected.

65.     At sentencing, the District Court overruled the defendant's objections, held that Wells possessed all of the 21 weapons in the safe and his bedroom, and stated:

> Okay. I think the government has proven by clear and convincing evidence that he [Wells] had full access to those weapons and had the ability to

possess and did possess them at any time he wanted, apparently. Those were available to him. He had – they were in – he knew where they were, he knew how to get them, and in fact he had gotten them in the past.

***

So I'm going to overrule the defendant's objection. I'm going to find that the six-level enhancement pursuant to United States Sentencing Guideline Section 2K2.1(a)(4)(B)(I)(I) is appropriate. Now, we also have an objection to the four-level enhancement pursuant to United States Sentencing Guideline Section 2K2.1(b)(1) for the number of firearms involved in the instant offense. I think there's really not much to argue after I've made my findings.

66.    The District Court, therefore, found that Wells possessed, and had access to "any time he wanted," all of the defendant firearms and the defendant high-capacity magazines.  The Court sentenced Wells to 37 months and forfeited his interest in the defendant property.

### *Pismennaya an Alien in Possession of Firearms and Ammunition*

67.    Records from the Department of Homeland Security showed that Pismennaya was illegally in the United States and thus prohibited from possessing firearms and ammunition. However, by her own admission, Pismennaya possessed or had access to at least a portion of the defendant property found in her home and garage.

### *Third-Party Criminal Petition to the Defendant Property by Miller, CR17-01114-PHX-DLR*

68.    Miller claimed in his petition that he was the owner of the defendant property and that the defendant property was comprised of purchases he had made and gifts from his family.

/ /

/ /

12

*Third-Party Ancillary Proceedings, CR17-01114-PHX-DLR*

69.    On September 25, 2018, the government, with the consent of Miller's attorney, requested a discovery schedule and ancillary hearing date from the Court regarding Miller's petition to the defendant property.

70.    On September 27, 2018, the Court granted the government's request for a discovery schedule and an ancillary hearing date.

71.    On October 18, 2018, the government mailed special interrogatories to Miller via his attorney.   On November 19, 2018, Miller responded to the special interrogatories by e-mail.

72.    Among his many answers, Miller said or admitted the following:

    a.    All of the defendant property belonged to him and no one else;

    b.    He had known Wells for over 30 years and had been aware of Wells' felony conviction for several years;

    c.    He did not allow Wells to handle the firearms (contradicting his earlier interview as well as the statements of Wells and Pismennaya in which they all said Wells had handled the firearms);

    d.    He did not know how Wells accessed his gun safe. He continued to claim no one else knew the safe combination except him;

    e.    He claimed that, as far as he was aware, Wells never accessed the safe; and

    f.    He claimed that the handgun found in Wells' bedroom closet was Miller's, though he did not give any explanation as to why Wells possessed it.

**Miller is not an Innocent Owner**

73.    Even if Miller owned the defendant property, it is subject to forfeiture because Miller is not an "innocent owner" under 18 U.S.C. § 983(d)(2)(A)(i) and (ii), which states that an "innocent owner" is a person who: "(i) did not know of the conduct giving rise to the forfeiture; or (ii) upon learning of the conduct giving rise to the

forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property."

74.     Miller knew that Wells was a convicted felon and he knew that Wells had access to, and possessed, firearms and ammunition at their residence.  Moreover, Miller failed to take reasonable steps to terminate Wells' unlawful use and possession of the defendant property, such as contacting law enforcement or removing the defendant property from their residence and storing it in a secured location that Wells could not access.

75.     Further, if a third party, like Miller, knows another is a felon, then the third party is not entitled to an "innocent owner" defense for a weapon or ammunition that is possessed by that felon. *See United States v. Ferro,* 681 F.3d 1105 (9th Cir. 2012); *Bentley v. Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 414 Fed.Appx. 28, 30-31 (9th Cir. 2011).

76.     In Miller's interview and his response to the special interrogatories, he repeatedly admitted that he was aware that Wells was convicted of unlawful intercourse with a minor, a felony, in 2004 in California.

77.     Before the defendant property was seized, Miller knew that Wells was a convicted felon.

78.     In addition to the Court finding in the criminal case that Wells possessed the defendant property, the following is additional evidence demonstrating that Wells and Pismennaya possessed and/or had ready and easy access to all of the defendant property:

          a.     Miller's interview in which he admitted to allowing Wells to handle firearms in his presence;

          b.     Miller's interview in which he admitted that some of the photos of guns on Wells' Facebook posts were photos of his guns;

          c.     Miller's interview where he admitted to helping Wells take pictures of weapons posted on Wells' Facebook page;

d.    Pismennaya's interview in which she said she observed Wells and Miller holding, fixing, and firing firearms together;

e.    Pismennaya's account of taking pictures of Wells with weapons for Facebook and an account of Wells retrieving a rifle from the garage;

f.    Pismennaya's interview in which she described moving gun parts so she could clean the house;

g.    Wells' admission that his fingerprints would be on most of, if not all of, the guns in the gun safe;

h.    Wells' ability to easily open the gun safe by memory with a combination;

i.    Wells' and Pismennaya's admission that the handgun found in their bedroom closet was possessed by Wells;

j.    Wells' Facebook posts showing pictures of weapons and pictures of him holding weapons;

k.    Wells' Facebook posts where he repeatedly claimed to possess weapons and ammo;

l.    Wells' conviction of possessing the handgun;

m.    Wells' admission that all of the defendant property facilitated his felon in possession charge;

n.    Wells' agreement to the criminal forfeiture of the defendant property;

o.    The defendant property was readily available to Wells, whether in the gun safe, his room, or the garage;

p.    The Court's finding at Wells' sentencing that there was "clear and convincing evidence" that Wells had possessed 21 weapons;

q.    The Court's finding at Wells' sentencing that Wells had access to high-capacity magazines; and

r.   Miller, who was buying the house where the defendant property was seized, left a large assortment of weapons and ammunition that were easily accessible to Wells throughout his residence while he regularly left his home for days at a time.   Miller did little, if anything, to limit Wells' access to, and possession of, the defendant property.

79.   Wells' interest in the defendant property was forfeited in the criminal case because it facilitated his felon in possession conviction.

80.   The Facebook photos and posts, interviews of Wells, Miller, and Pismennaya, Wells' ability to open the gun safe, and the Court's findings at sentencing all demonstrate that Miller allowed Wells easy access to, and possession of, the defendant property.

***Miller Aided and Abetted a Felon (Wells) to Possess Firearms and Ammunition***

81.   While the evidence clearly shows Wells possessed and had access to all of the defendant property, it also undoubtedly demonstrates that Miller aided and abetted Wells' possession of this same defendant property.

82.   Miller was a homeowner who allowed Wells, a known felon, to live with him. Miller knew multiple weapons, magazines, and over 22,000 rounds of ammunition were in his home and attached garage.

83.   Miller did not prohibit Wells' access to the defendant property.

84.   Miller admitted that Wells handled guns in Miller's presence.

85.   Miller admitted that Wells took pictures of the guns while in the house.

86.   Miller admitted that he would frequently leave the house and the defendant property for days at a time and that he did not know what Wells did with the defendant property in his absence.

//

//

**Miller Aided and Abetted an Illegal Alien (Pismennaya) to Possess Firearms and Ammunition**

87.     Pismennaya possessed and had access to at least some of the defendant property.

88.     Miller was a homeowner who allowed Pismennaya, an illegal alien, to live with him. Miller knew multiple weapons, magazines, and over 22,000 rounds of ammunition were in his home and attached garage.

89.     Like with Wells, it does not appear Miller made any attempts to prohibit Pismennaya's access to the defendant property.

90.     Miller admitted that he would leave the house and the defendant property frequently for days at a time.

## FIRST CLAIM FOR RELIEF

The defendant property was a firearm or ammunition involved in or used in a knowing violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), Felon in Possession of a Firearm, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 924(d).

## SECOND CLAIM FOR RELIEF

The defendant property was a firearm or ammunition involved in or used in a knowing violation of 18 U.S.C. §§ 2 and 922(g)(1), Aiding and Abetting a Felon in Possession of a Firearm, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. 924(d).

## THIRD CLAIM FOR RELIEF

The defendant property was a firearm or ammunition involved in or used in a knowing violation of 18 U.S.C. § 922(g)(5), Alien in Possession of a Firearm, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 924(d).

## FOURTH CLAIM FOR RELIEF

The defendant property was a firearm of ammunition involved in or used in a knowing violation of 18 U.S.C. §§ 2 and 922(g)(5), Aiding and Abetting an Alien in

17

Possession of a Firearm, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. 924(d).

## NOTICE TO ANY POTENTIAL CLAIMANT

If you assert an interest in the subject property and want to contest the forfeiture, you must file a verified claim that fulfills the requirements set forth in Supplemental Rule G. To avoid entry of default, a verified claim must be filed no later than thirty-five days from the date this Complaint has been sent in accordance with Supplemental Rule G(4)(b).

An answer or motion filed under Fed. R. Civ. P. 12 also must be filed no later than twenty-one days after filing the claim. The claim and answer must be filed in the United States District Court for the District of Arizona under the case number listed in the caption above and a copy must be served upon the undersigned Assistant United States Attorney at the address provided in this Complaint.

This notice provision does not provide you with any legal advice and is designed only to provide you with a general understanding of these proceedings. Any statements made in your claim or answer may be introduced as evidence against you in any related or future criminal case. You should consult an attorney to represent your interests in this matter, and note that a stay of proceedings may be available under 18 U.S.C. § 981(g)(2).

IF YOU ARE A VICTIM, and have sustained economic loss as a result of the crime(s) giving rise to this civil action, you may be entitled to petition for remission, mitigation, or restoration under Title 28, Code of Federal Regulations ("C.F.R."), section 9.2. In lieu of filing a Claim with the Court, you may promptly submit a letter outlining your interest in the property to the undersigned Assistant United States Attorney. Plaintiff will notify you when it has received your letter, and further instructions may be provided upon conclusion of this action. The United States Attorney General shall have sole responsibility for disposing of petitions for remission or mitigation with respect to property involved in a judicial forfeiture proceeding under 18 U.S.C. § 981(d) and 21 U.S.C. § 881(d). If your status as a victim is contested, timely receipt of your letter will not shield you from entry of default for failing to file a proper claim with the Court.

IF YOU ARE A LIENHOLDER, it is the policy of the United States Attorney's Office to honor all claims received from legitimate titled lienholders as defined under 28 C.F.R. § 9.2. In lieu of filing a claim with the Court, you may send a letter to the undersigned Assistant United States Attorney outlining your interest in the property, including: (1) the amount presently owed on the lien; (2) a copy of the security agreement setting forth your interest; and, (3) whether the owner is in default. If your lien is sufficient, Plaintiff will notify you to verify receipt of your letter. In the event of forfeiture, and to the extent practicable, proceeds from the sale and disposition of the subject property will be remitted to you in satisfaction of the lien. As noted above, timely receipt of your letter will not shield you from entry of default for failing to file a proper claim with the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that process issue for an arrest warrant *in rem* issue for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

Respectfully submitted this February 20, 2019.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*S/Mark J. Wenker*
MARK J. WENKER
Assistant United States Attorney

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# Exhibit B




1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit C

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28








# Exhibit D





# Exhibit E




# Exhibit F

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# Exhibit G

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28











## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the District of Arizona.

**The completed cover sheet must be printed directly to PDF and filed as an attachment to the Complaint or Notice of Removal.**

Plaintiff (s): **United States of America**

Defendant (s): **Twenty-one firearms, one partial firearm, and a large amount of ammunition and magazines of various calibers**

County of Residence: Maricopa

County of Residence: Maricopa

County Where Claim For Relief Arose: Mohave

Plaintiff's Atty(s):

**Mark J. Wenker , AUSA**
**40 N. Central Ave., Ste. 1800**
**Phoenix, Arizona  85004**
**602 514-7500**

Defendant's Atty(s):

II. Basis of Jurisdiction:          **1. U.S. Government Plaintiff**

III. Citizenship of Principal Parties (Diversity Cases Only)

    Plaintiff:- **N/A**
    Defendant:- **N/A**

IV. Origin :          **1. Original Proceeding**

V. Nature of Suit:          **690 Other**

VI. Cause of Action:          **In Rem**

VII. Requested in Complaint

    Class Action: **No**
    Dollar Demand:

Jury Demand: **No**

<u>VIII. This case</u> **IS RELATED** to Case Number **CR17-01114-PHX-DLR** assigned to Judge **Douglas Rayes.**

**Signature:** **s/Mark J. Wenker**

**Date:** **02/20/2019**

**If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, save this form as a PDF and include it as an attachment to your case opening documents.**

Revised: 01/2014

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, Jason Saitta, verify and declare under penalty of perjury that, I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Complaint for Forfeiture *In Rem* and know the contents, and that the matters contained in the Complaint are true to my own knowledge, except that those matters alleged upon information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case.

I verify and declare under penalty of perjury that the foregoing is true and correct. Executed on this 19th day of February, 2019.

Jason Saitta
Federal Bureau of Investigation